JOHN F. BASHWINER, APPELLANT, v. POLICE AND FIRE-
MEN'S RETIREMENT SYSTEM OF NEW JERSEY, RE-
SPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 3, 1961—Decided May 25, 1961.

(1)

Before Judges GOLDMANN, FOLEY and NADEL.

*Mr. C. Russell Kramer* argued the cause for appellant (*Messrs. Reed, Reynolds, Smith & Kramer,* attorneys).

*Mr. Lee A. Holley,* Deputy Attorney General, argued the cause for respondent (*Mr. David D. Furman,* Attorney General, attorney).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Appellant Bashwiner appeals from the decision of the Board of Trustees of the Police and Firemen's Retirement System of New Jersey declaring him ineligible for enrollment in the System because he was over the maximum age limit of 30 at the time of his appointment as patrolman in the Bloomfield Police Department, *N. J. S. A.* 43:16A–3. Respondent did not consider his military service as having been "in time of war," so as to bring him within the exception of *N. J. S. A.* 43:1–1.1. These two statutes, as well as others relevant to the determination of this appeal, are more fully discussed below.

Appellant was born December 27, 1929 and at the time of his permanent appointment to the police department on February 1, 1960 was 30 years and 35 days of age. He had served three years in the United States Marine Corps, from June 17, 1947 to June 16, 1950. The local appointing

authority considered this service as having been "in time of war." The Retirement System takes the position that it considers military service to be "in time of war" only if it commenced before December 31, 1946. This policy is reflected in the rules and regulations adopted by its board of trustees on April 20, 1959, recognizing the lawful termination date of World War II as December 31, 1946.

Appellant argues two points on this appeal: (1) his military service was "in time of war," as that phrase is used in *N. J. S. A.* 38:23A–2, and therefore this period of service can be subtracted from his age at the time of appointment in order to qualify him, and (2) he is entitled to membership in the System, regardless of his age, under *N. J. S. A.* 43:16A–49.

## I.

Age has for some time been one of the qualifications for appointment of policemen by municipalities. Originally, the maximum age limit was 55 years, *L.* 1915, *c.* 373, § 2. This was reduced to 40 by *L.* 1931, *c.* 335; to 35 by *L.* 1939, *c.* 318; and then to 30 by *L.* 1945, *c.* 219. The present statute, enacted in 1953 (*c.* 299), and in effect on February 1, 1960 when appellant was appointed a policeman, appears in *N. J. S. A.* 40:47–4. It retains the maximum age limit of 30 in all municipalities except those in counties of the third class having a population of less than 75,000, where a person may be appointed policeman if not more than 35 years old.

The provisions of *N. J. S. A.* 40:47–4 have since 1945 been expressly made subject to *L.* 1944, *c.* 98 (*N. J. S. A.* 38:23A–2), a veterans' preference statute, giving persons who served in the active military service after July 1, 1940, and "in time of war," credit for the period of such service in computing maximum age limitations for appointment to governmental office, position or employment. It reads, in pertinent part:

"When the qualifications for any examination * * * or appointment * * * to any office, position or employment **under the government of** * * * any * * * municipality * * * includes a maximum age limit, any person, who, heretofore and subsequent to July first, one thousand nine hundred and forty, entered or hereafter, in time of war, shall enter the active military or naval service of the United States * * * shall be deemed to meet such maximum age requirement, if his actual age, less the period of such service, would meet the maximum age requirement *in effect on the date the person entered into such service of the United States.*"

The italicized language was added by *L.* 1946, *c.* 206. Appellant entered the service on June 17, 1947, and as of that date the maximum age for appointment for a patrolman was 30 years, the same as presently.

Subsequent to the passage of *L.* 1944, *c.* 98 (*N. J. S. A.* 38:23A–2), the Legislature established the Police and Firemen's Retirement System by enacting *L.* 1944, *c.* 255 (*N. J. S. A.* 43:16A–1 *et seq*), effective July 1, 1944. Section 3 (now *N. J. S. A.* 43:16A–3) provided that after that date any person becoming a policeman in a municipality which was a participant in the Retirement System "shall become a member of this retirement system as a condition of his employment; *provided,* that his age at becoming such a policeman * * * is not over thirty years; * * *."

On July 1, 1944, the effective date of the Police and Firemen's Retirement System Act, the maximum age for appointment to a municipal police force, as fixed by *N. J. S. A.* 40:47–4, was 35. Further, as already noted, this appointment provision was expressly made subject to the veterans' preference statute, *L.* 1944, *c.* 98 (*N. J. S. A.* 38:23A–2). The legislative scheme at this point in time presented a serious contradiction. On the one hand, the appointing statute contained an age limit of 35 and was subject to the veterans' preference provision. On the other hand, membership in the Retirement System, a condition of employment, was subject to an age limit of 30 and did not come within the purview of the veterans' preference statute, which referred only to examinations and appointments. Consequently, the

Legislature in 1945 acted to harmonize the appointment provisions with the Retirement System Act. On April 24 it passed *L*. 1945, *c*. 219, already referred to, amending *N. J. S. A*. 40:47–4 by reducing the age limit for police appointments to 30. Then, on May 4 it enacted *L*. 1945, *c*. 305 (*N. J. S. A*. 43:1–1.1), almost identical with the veterans' preference statute relating to appointments except that it dealt with the maximum age limit in pension funds or retirement systems. The statute provided:

"When the qualifications for eligibility for membership in any existing pension fund or retirement system of this State or of any county, municipality, school district or other political subdivision of this State, * * * includes a maximum age limit, any person who, heretofore and subsequent to July first, one thousand nine hundred and forty, entered or hereafter, in time of war, shall enter the active military or naval service of the United States * * * shall be deemed to be below such maximum age limit if his actual age, less the period of such service, would be below the age limit *in effect on the date the person entered into such service of the United States*."

The italicized language was added by *L*. 1946, *c*. 308, as in the case of the veterans' preference statute relating to appointments.

It is therefore manifest that appellant is in error, under the first of his contentions, in relying on *N. J. S. A*. 38:23A–2 for his veteran's preference, since this section, dealing only with examinations and appointments, is not controlling. Rather, *N. J. S. A*. 43:1–1.1, relating to pension funds or retirement systems, is the statute to be considered.

Although the strict holding of this case must be an interpretation of the meaning of "in time of war" as used in the retirement statute, *N. J. S. A*. 43:1–1.1, the same interpretation would necessarily have to be placed on the phrase in the appointment law, *N. J. S. A*. 38:23A–2. Were this not so, the legislative intention to harmonize the two sections would be destroyed. True, the validity of appellant's appointment as patrolman is not before this court;

he merely seeks enrollment in the Retirement System. Nevertheless, should we hold that he was correctly denied membership in the System because his military service was not "in time of war," such a holding would undercut the validity of his appointment. See *Seire v. Police & Fire Pension Comm'n of Orange*, 6 *N. J.* 586, 590 (1951).

Our problem is to discern the legislative purpose in using the phrase "in time of war" in *N. J. S. A.* 43:1–1.1 The Legislature has never specifically defined the term. The only definition to which we have been referred by appellant is that contained in *L.* 1942, *c.* 72 (*N. J. S. A.* 1:1–2a), passed soon after our entry into World War II against Japan, Germany and Italy, and which defines "present war" and similar phrases:

"Unless it be otherwise expressly provided or there is something in the subject or context repugnant to such construction, the following words, phrases and clauses, namely: 'present war,' 'present war emergency,' 'the existing state of war,' 'present defense emergency,' when used or named within this State in any manner whatsoever with relation to a period of time shall mean so long as the United States of America continues in the present wars with the governments of Japan, Germany and Italy, or any of them, and until the making of a treaty or treaties of peace concluding all of said wars."

In *Publix Asbury Corp., Inc. v. Asbury Park*, 18 *N. J. Super.* 286 (*Ch. Div.* 1951), affirmed o. b., 18 *N. J. Super.* 192 (*App. Div.* 1952), the court held that the definition in *N. J. S. A.* 1:1–2a was limited to the particular words and phrases expressly set out therein, and did not control the interpretation of the phrase "duration of the war" used in the lease in litigation. The court construed "duration of the war" as meaning the duration of actual hostilities—the "shooting war"—which the parties stipulated had terminated September 2, 1945.

Appellant argues, however, that it does not necessarily follow that because "in time of war" is not specifically defined in any statute, the Legislature meant to limit its applica-

bility to service during actual World War II fighting. He maintains that the phrase covers any military service after July 1, 1940, the date mentioned in both *N. J. S. A.* 38:23A–2 and *N. J. S. A.* 43:1–1.1. Since the Legislature considered the signing of a peace treaty or treaties as the end of the war for the purposes of the definition in *N. J. S. A.* 1:1–2a, he urges that a similar interpretation be placed on the phrase "in time of war" contained in *N. J. S. A.* 43:1–1.1.

To bolster his argument, appellant directs our attention to *Feil v. Senisi*, 7 *N. J. Super.* 517 (*Law Div.* 1950), where the court considered the "in time of war" phrase appearing in *L.* 1945, *c.* 167 (then *N. J. S. A.* 2:24–26, now *N. J. S.* 2A:14–26), extending the time for the bringing of an action against a person who is in military service:

"The period of service, in time of war and 6 months thereafter, of any person, in active service in any of the armed forces of the United States * * * shall not be included in computing any period limited on April 16, 1945, or thereafter by any law for the bringing of any action by or against any such person * * * whether such cause of action shall have accrued prior to, or during, the period of such service or during such 6 months thereafter."

In *Feil* plaintiff's alleged cause of action for personal injuries accrued August 30, 1947, and was brought two years and one day later. Defendant had served in the armed forces from May 8, 1944 until his discharge on May 30, 1947, but reenlisted on June 10, 1947. He was still on active duty outside the State on November 7, 1949, when he moved to dismiss the claim against him because barred by the statute of limitations. Defendant took the position that his military service after August 30, 1947 was not "in time of war," and should therefore be included in computing the two-year limitation period. Judge (now U. S. Supreme Court Justice) Brennan, writing for the court, said:

"I hold that defendant's active military service was on August 30, 1947, and continued to be up to the commencement of this suit, 'in time of war,' and that no part of the time of such service is

includible in the computation of the period of the bar. It is true that the shooting has long since stopped as between this nation and its Axis enemies and that the President of the United States has by Proclamation proclaimed 'the cessation of hostilities' effective 12:00 o'clock noon, December 31, 1946 (*Presidential Proclamation* No. 2714, December 31, 1946, 12 *Fed. Reg.* 1; *U. S. C. A., Title* 50, *App.,* § 601, *p.* 152, *P.P.*). However, that proclamation was carefully phrased to recognize that a 'state of war' still obtained on that date, and it still exists between the United States and the former Axis countries and can be ended only by some formal termination, probably by treaties of peace." [citing cases] * * *"
(7 *N. J. Super.*, at *pages* 519–520)

He noted that *N. J. S. A.* 1:1–2a, "while not controlling," was "certainly pertinent," and concluded:

"It follows that so long as we remain as a nation officially in a 'state of war' military service will continue to be 'in time of war.' The realities of the day may suggest, as defendant urges, the necessity for reconsideration of the need or scope of *R. S.* 2:24–26 [*N. J. S. A.* 1:1–2a] but that, of course, is a legislative and not a judicial province." (at *page* 520)

*Feil v. Senisi* was an interlocutory decision of the Law Division on a motion to dismiss, never appealed. It was decided March 13, 1950, prior to the time when formal peace treaties were executed by our country. Judge Brennan recognized that it was for the Legislature to determine when the state of war ended. The Legislature has since taken necessary action to define the dates of World War II in connection with a number of statutes, referred to below.

With regard to Judge Brennan's reference in *Feil* to *N. J. S. A.* 1:1–2a being pertinent but not controlling, we observe that he later sat on the Appellate Division part which affirmed the *Publix Asbury Corp.* case, where the court strictly limited the statutory definition to the particular phrases therein set forth.

▋ The *Feil* case is but another example of the general rule that for the purposes of abatement of a state statute of limitation, where the statute does not provide for a specific cut-off date, war should be treated in its *technical* sense, i. e., as ending only with the signing of treaties or a proclama-

tion, and not in the *ordinary* sense, as terminating with the cessation of actual hostilities. See Annotation, 137 *A. L. R.* 1454, 1463 (1942). The purpose of tolling statutes of limitation while persons are in military service is to give them every opportunity to obtain counsel and witnesses, and to appear in court and be heard, either in prosecuting or defending an action. Obviously, this purpose is just as valid in the case of a man fighting on an island in the South Pacific as it is if he is part of an occupation force in Germany after hostilities have ceased.

The Statement attached to *Assembly Bill No.* 405, which became *L.* 1945, *c.* 305, now *N. J. S. A.* 43:1–1.1, suggests the real purpose of the enactment. It reads:

"Chapter 98, P. L. 1944 [*N. J. S. A.* 38:23A–2] provides that persons in the armed forces of the United States shall not be deprived of their right to appointment by reason of any age limit heretofore fixed for appointment. However, such persons will be deprived from membership in a pension fund or retirement system *when their age upon discharge from the armed forces exceeds the maximum imposed by such pension statute.* This bill will accord them the same privileges to enter a pension fund as it does for appointment to public position or office." (Italics ours)

We cannot divorce this legislation from the very real events surrounding it. *L.* 1945, *c.* 305, became effective immediately upon approval, May 4, 1945. This was the day when the German armies, in general retreat for several months, began to surrender. The unconditional surrender was signed three days later. The Legislature undoubtedly had in mind the many men who had been called into service in their late 20's and would soon be returning to civilian life. A significant number would be over the age of 30 at the time they might decide to join the local police force. (The veterans' preference legislation also applied to those joining a fire department.) The legislative purpose, reflected in the statement just quoted, was to protect these men.

■ We take judicial notice of the fact that after hostilities had ended, those inducted into our armed forces were

almost entirely younger men. Their period of service would be two or three years—not the unlimited period of a "shooting war." They would have ample opportunity to join a police or fire department before reaching the maximum age.

█ We conclude that the Legislature, when it employed the phrase "in time of war" in *N. J. S. A.* 43 :1–1.1, referred to the period of actual hostilities.

Appellant was in the United States Marine Corps from June 1947 to June 1950. He entered at age $17\frac{1}{2}$ and was discharged at age $20\frac{1}{2}$. More than $9\frac{1}{2}$ years later he accepted permanent appointment to the Bloomfield Police Department. He had had more than enough time to adjust himself to civilian life, make his decision to become a policeman, and join the Retirement System. We perceive no inequitable result visited upon him by our construction of *N. J. S. A.* 43 :1–1.1.

Respondent has provided us with a scholarly analysis of the many cases which have dealt, in a variety of settings, with the problem of when war ends under the respective statutes involved. Its counsel has sought to demonstrate that where the question concerns the federal government, its war powers, rights over aliens, or its relations with states or citizens, the mere cessation of hostilities does not generally mark the end of the war. War is viewed in its technical and legalistic sense, and is considered as coming to an end with the execution of formal peace treaties, or congressional proclamation. On the other hand, where private rights are involved, whether conferred by a state legislature, or arising from a contractual relation or a will, courts have not relied upon the strict legalistic definition of war but have used its ordinary meaning: war ends with the cessation of actual hostilities, rather than when a peace treaty is signed.

Although we appreciate counsel's exhaustive research, and the fact that the decisions generally support the distinction he draws, we choose to deal with the problem before us within the frame of reference of our own statutes.

When the Legislature enacted *L. 1944, c.* 98 (*N. J. S. A.* 38:23A-2, effective April 13, 1944), and *L. 1945, c.* 305 (*N. J. S. A.* 43:1–1.1, effective May 4, 1945), it had no occasion to define the termination of World War II. These measures were passed at the height of the fighting. After hostilities terminated, the Legislature on a number of occasions addressed itself to legislation defining when World War II ended.

The 1947 *Constitution, Art.* VIII, *Sec.* I, *par.* 3, gives tax exemption to honorably discharged veterans who served "in time of war or of other emergency as, from time to time, defined by the Legislature." *Art.* VII, *Sec.* I, *par.* 2 provides for preferential treatment in the civil service to such persons serving "in time of war" as might be provided by law. The Legislature has acted in the light of these constitutional provisions.

*L. 1951, c.* 184, § 1, dealing with tax exemption for honorably discharged veterans, provided in *section* 1(a), now *N. J. S. A.* 54:4–3.12i, that

"1. As used in this act:
(a) 'Active service in time of war' means active service at sometime during one of the following periods:
\* \* \* \* \* \* \* \*
World War II, December 7, 1941 to September 2, 1945;
\* \* \* \* \* \* \* \*
(h) 'Veteran' means any citizen and resident of this State honorably discharged or released under honorable circumstances from active service in time of war in any branch of the Armed Forces of the United States. \* \* \*"

Similarly, in dealing with veterans' preferences under the Civil Service Law, the Legislature provided, in *N. J. S. A.* 11:27–1:

"As used in this subtitle: \* \* \*
\* \* \* \* \* \*
'Veteran' means any honorably discharged soldier, sailor, marine or nurse who served in any army or navy of the allies of the United States \* \* \* in World War II, between September 1, 1939, and September 2, 1945, \* \* \* or any soldier, sailor, marine,

airman, nurse or army field clerk, who has served in the active military or naval service of the United States and has or shall be discharged or released therefrom under conditions other than dishonorable, in any of the following wars * * *

* * * * * * * *

(10) World War II, after September 16, 1940, who shall have served at least 90 days commencing on or before September 2, 1945, in such active service * * *."

This statute traces back to *L.* 1932, *c.* 122, § 3 (29a). By amendment in 1942 (*L.* 1942, *c.* 84) "veteran" was defined to mean any soldier, sailor, marine, etc. who served in any of certain designated wars. Listed were the then wars with Japan, Germany and Italy, "from the beginning of hostilities on December seventh, one thousand nine hundred and forty-one, and until the making of a treaty or treaties of peace concluding all of said wars." It is interesting to note that September 2, 1945 was soon substituted as the termination date of World War II in place of treaties. The quoted language of *N. J. S. A.* 11:27–1 has as its direct source amendments made by *L.* 1946, *c.* 227, § 1 and *L.* 1947, *c.* 63, § 1.

The Legislature has on yet other occasions sought to confine World War II or eligibility for veterans' status to the time war was actually being waged. Thus, in the Veterans' Loan Act (1944) a veteran is defined as "any *bona fide* resident of the State who has or shall have served in the active military or naval service of the United States at any time after September sixteenth, one thousand nine hundred and forty, and prior to December thirty-first, one thousand nine hundred and forty-six, * * *." *L.* 1944, *c.* 126, § 7, as amended by *L.* 1951, *c.* 89, § 1; *N. J. S. A.* 38:23B–7. In the legislation dealing with the education of war orphans, *N. J. S. A.* 38:20–1 *et seq.,* World War II is defined as "any time between September 16, 1940, and September 2, 1945." *L.* 1944, *c.* 197, § 1, as amended by *L.* 1951, *c.* 65, § 1, and *L.* 1955, *c.* 174, § 1; *N. J. S. A.* 38:20–1.

*N. J. S. A.* 43:15A–6(*l*) (*L.* 1954, *c.* 84, § 6), the definition section of the Public Employees' Retirement System Act,

fixed the dates of World War II as between September 1, 1939 and September 2, 1945. *N. J. S. A.* 18:13–112.4(r) (*L.* 1955, *c.* 37, § 2), the definition section of the Teachers' Pension and Annuity Fund Act, adopts the same period. With regard to these two acts, respondent has called our attention to the fact that the Veterans' Pension Act, *N. J. S. A.* 43:4–1 *et seq.,* had for years been operative for persons serving "in any war." Those who administered the act had been forced to resort to other related legislation to determine what was meant by the phrase. These administrative interpretations were codified upon the respective adoptions of the veterans' provisions in the Public Employees' Retirement System and Teachers' Pension and Annuity Fund Acts, *L.* 1954, *c.* 84, and *L.* 1955, *c.* 37.

The legislative expressions with regard to the duration of World War II are clear evidence that the Legislature used "war" in its ordinary sense, and not in its technical or legalistic definition. It has never used the phrase "in time of war" in the sense adopted by courts in construing federal action or war power.

██ It is, of course, axiomatic that wherever possible we should interpret a particular statute, such as *N. J. S. A.* 43:1–1.1, to accord with statutes *in pari materia.* *Key Agency v. Continental Casualty Co.,* 31 *N. J.* 98, 103 (1959); 2 *Sutherland, Statutory Construction* (*3d ed.* 1943), § 5002, *p.* 484. Policemen are appointed pursuant to the Civil Service Act and given veterans' status in accord with the definition of World War II set out therein. Other veterans, participating in our pension and retirement systems, are afforded veterans' status in accordance with the definitions of World War II hereinabove mentioned. The same is true of tax exemption legislation. Accordingly, the meaning of "in time of war" should be "assessed as a homogeneous whole for the ascertainment of the common policy." *Salz v. State House Commission,* 18 *N. J.* 106, 113 (1955).

██ We therefore conclude that to interpret "in time of war" as used in *N. J. S. A.* 43:1–1.1 as meaning any time

up to March 20, 1952, when the peace treaty with Japan, signed in San Francisco on September 8, 1951, was ratified by the United States Senate (*U. S. Code, Congressional Service* 1952, *p.* LXV), would be to violate the legislative scheme. None of the veterans' statutes considers the formal signing of the peace treaty with Japan or its ratification on March 20, 1952 as ending the war. With the exception of the Veterans' Loan Act, which considers the proclamation of President Truman on December 31, 1946 (*Presidential Proclamation No.* 2714, 12 *Fed. Reg.* 1 (1947); 50 *U. S. C. A. Appendix,* § 601, *p.* 668) that hostilities had ceased, as being the end of the war, the remaining statutes consider September 2, 1945, the signing of the formal Japanese surrender, as ending World War II.

We hold that petitioner's service from 1947 to 1950, was not "in time of war" within the purview of *N. J. S. A.* 43:1–1.1.

## II.

Appellant argues that even if his military service is not to be considered as rendered "in time of war," he is still entitled to enrollment by virtue of *N. J. S. A.* 43:16A–49, regardless of the fact that he was over 30 when appointed a patrolman.

*N. J. S. A.* 43:16A–49 provides:

"The board of trustees of the police and firemen's retirement system of New Jersey shall accept, as members into the retirement system, policemen otherwise eligible for membership, notwithstanding that they were over thirty years of age at the time of their appointment as policemen provided there is paid into the system, in such manner as the board shall prescribe, the contributions that would have been paid had they been so appointed at the age of thirty years."

Appellant claims that this statute makes it mandatory for the Retirement System to accept him into membership, and he avers that he is ready, willing and able to pay the necessary contributions.

Standing alone, *N. J. S. A.* 46:16A–49 would seem to have the meaning appellant assigns to it. However, the quoted provision was section 2 of *L.* 1953, *c.* 299, whose title read as follows:

"AN ACT fixing age limits for the appointment of members of paid fire or police departments in municipalities of this State, amending section 40:47–4 of the Revised Statutes and *supplementing* 'An act for the establishment of a police and firemen's retirement system for the police and firemen of a municipality, county or political subdivision thereof,' approved May twenty-third, one thousand nine hundred and forty-four (*P. L.* 1944, *c.* 255)." (Italics ours)

Appellant would have us read section 2, which is clearly *supplementary*, as amending and virtually repealing the membership provisions of *L.* 1944, *c.* 255 (*N. J. S. A.* 43:16A–1 *et seq.*). *N. J. S. A.* 43:16A–3, it will be recalled, provided that any person becoming a full-time policeman in a municipality was required to become a member of the Retirement System as a condition of his employment, provided his age at the time of becoming such policeman was not over 30 years.

Section 1 of *L.* 1953, *c.* 299 (as indicated in the title) amended *N. J. S. A.* 40:47–4, which fixes a maximum age of 30 for persons appointed to the police department, except that in counties of the third class having a population of less than 75,000, the maximum age was fixed at 35. Manifestly, section 2 must be read in conjunction with section 1. The sole function of section 2 was to permit appointees in municipalities falling within the exception of section 1, who might be over 30 but less than 35 years of age, to enroll in the Retirement System by paying back-contributions so as to preserve its actuarial soundness.

Were section 2 of *L.* 1953, *c.* 299, read as amending *N. J. S. A.* 43:16A–3 to the extent that it does away with the prohibition against membership for persons over the age of 30, it would run counter to the constitutional mandate against amendment of a statute without setting it forth

at length. 1947 *Const., Art.* IV, *Sec.* VII, *par.* 5. Additionally, if the object of *L.* 1953, *c.* 299 were, in fact, twofold, as appellant contends—*i. e.,* to extend the age maximum for certain policemen in the third-class counties to 35 years, and to do away with the maximum age requirements for membership in the Retirement System—the statute and its conflicting objects would also run contrary to *Art.* IV, *Sec.* VII, *par.* 4 of the 1947 *Constitution.*

██ Appellant can assign no significance to the fact that section 2 of the 1953 act was placed under *Title* 43, *Chapter* 16A. Obviously, this was done because the act itself provided that section 2 was supplementary to *Title* 43, *Chapter* 16A, and it is for this reason, and this reason alone, that the section was physically placed out of context with section 1. The classification and arrangement of sections in the *Revised Statutes* are "made for the purpose of convenience, reference and orderly arrangement, and therefore no implication or presumption of a legislative consideration is to be drawn therefrom." *R. S.* 1:1–5; *Asbury Park Press v. Asbury Park,* 19 *N. J.* 183, 199 (1955).

We therefore conclude that there is no merit in appellant's second argument. The determination of the Board of Trustees of the Police and Firemen's Retirement System of New Jersey is affirmed.